Please be seated. Mr. Clerk, will you call the next case please? Case number 3-090561, Eastwood State, Illinois, affidavit SNAE-AOLC v. Warren v. Snapp, challenged by Patrick Bertani. Mr. Bertani? May it please the Court, Counsel. Chief Justice Kilgore. What a pleasure it is to be in this venue that is so much different, not as formal, but better attended than the traditional trappings that we have down in Ottawa. And it's a little bit uncomfortable for me as a result because one of the first things they're going to hear me say is something that they're probably never going to hear an attorney say ever again in their lives. And here it goes. I made an error. I made a mistake with regard to the statutory burden of proof in my opening brief. And what better place to come and do this and make that confession than a Christian Brothers University? This case was tried in both the State's Attorney's Office and the attorney who represented Mr. Snapp at the trial court level using the burden of proof of beyond a reasonable doubt. They were mistaken. They mistakenly informed the judge. The judge mistakenly applied the burden of beyond a reasonable doubt. As my learned opponent has pointed out, on June 1st of 2006, the statutory burden of proof changed from beyond a reasonable doubt to clear and convincing evidence. In fairness to you, though, that standard of clear and convincing evidence has yet to be reviewed by the Illinois Supreme Court. It has, but I am constrained to advise this court that it was reviewed by the Fifth District Appellate Court and they found that that standard met constitutional due process muster. And that's the case of People v. Craig. So what better for your client, though, to have the standard of proof be beyond a reasonable doubt because the newest standard enacted by statute seems somewhat in question. So I know you're throwing yourself on the sword, but there are those that would consider you to be a very good advocate for making sure reasonable doubt was applied. Yes, and again, I was going to say that I disagree with the finding in that People v. Craig case. And I maintain my position that was set forth in my brief, and I don't want to go a lot into that. But Traynor and its progeny has time and time again at times when the statute was silent with regard to what the burden of proof would be as said beyond a reasonable doubt. And the case law is replete with references to while we don't have all of the criminal rights in this civil case, we have most of them. And they repeatedly refer to that burden of proof. And that has been the history of these cases. And, Mr. Bertani, a Fifth District decision is not binding on this court. I understand that. But I thought that it was my obligation to advise this court that I was aware of that, and I presume that you folks were, but you never know. You're to be commended. Okay. You know, and depending on what happens with that standard, I have also argued that the issue of waiver by stipulation or failure to object, and I think that's a valid point, too, but I don't even think you have to go there to decide this case. You need not release Mr. Snapp on some technicality of waiver. You need to order his at least conditional release, because no matter what standard we have in this case, I believe the evidence was wanting and lacking with regard to whether the state proved he should still be confined. As I've set forth in my brief, there were four potential issues that could have been tried in a court. Only one of them was in this Sexually Dangerous Persons Commitment Act case. The issue of mental disorder greater than one year was not contested, was not litigated. The testimony and the evidence was that he, that Mr. Snapp suffers from pedophilia, that he did and he does. The criminal propensities for the commission of sexual offenses was not contested by trial counsel in the lower court. His history establishes that. Demonstrated propensities towards acts of sexual assault or acts of sexual molestation of children, again, that is a matter of record from his history and weren't challenged. But those are kind of the factors, for the most part, that look backward, and this is, after all, a recovery proceeding. Has he recovered? Mr. Snapp has been confined and undergone treatment for ten years, and that brings us to the issue, the one that is contested. Has he recovered through his treatment for these past years? And the standard in that particular case, and in every case that's set forth by our Illinois Supreme Court in Masterson, is that there must be, in order to keep him confined, there must be an explicit finding that it is substantially probable that the defendant will engage in sex offenses in the future if not confined. Substantially probable to commit sex offenses in the future if not confined. Now, what does substantially probable mean? Fortunately, we have a case that tells us, and it's been off-cited, and that's the in-reading detention of Hayes, and that was a Sexually Violent Persons Commitment Act case, slightly different, but still using the same standard. And that is, substantially probable means much more likely than not. And I submit to you folks that on a continuum of one to a hundred, that much more likely than not has to substantially exceed 50% or the words are meaningless. That brings us to the case at bar. The State relied on essentially two witnesses, Dr. Angeline Stanislaus, who is a forensic psychologist, and Dr. Mark Karich, who is a Ph.D., not a medical doctor, or a psychologist, both of whom are employed by the Illinois Department of Corrections. Neither witness has participated in any of the treatment of Mr. Snap. They based their conclusions in their report on a three-hour interview with him, together with a review of records that were available with regard to his criminal history and his treatment at the facility. In fact, the State didn't call anyone that had any real function with regard to treatment with regard to Mr. Snap in this case. And, of course, they opined that he would remain sexually dangerous. Dr. Stanislaus based her opinion on a belief that he didn't participate enough in therapy, he doesn't open up to others, and he has some trust issues with staff at the, I'm going to call it a prison because really that's what it is, and other SDPs, sexually dangerous persons. He has trust issues with his captors and fellow inmates. Imagine that. Dr. Karich, I said, has a bachelor's degree in psychology, but he's been the public service director of the SDP program since 1993. This is really his baby. And while Mr. Snap has voluntarily, and it is voluntary treatment at this facility, engaged in this treatment program that has been authored by Dr. Karich for a period of ten years, Karich doesn't think he's come far enough. You know, were that the only evidence in this case, I wouldn't be here. But what we have in this case are some actuarial tools or tests that have gained renown and reliability in the scientific community, actually, and have been recognized by our courts. And there's some very powerful evidence that he is not much more likely than not to reoffend. First one is the static 99 test. It's a psychological test. I'm not here to tell you that I understand its ins and outs. I do understand what the testimony was, and that it's static. It looks backwards. It looks at what has this person done in the past in terms of bad behavior. And if you take a test at point one and at point two, the test should be the same unless you have committed some other bad act in between. And the testimony on that test from Dr. Karich was actually somewhat confusing, I think as counsel points out in his brief as well. At times he said that test had him as a minimal risk or slight risk, and then he eventually said it was either a five or a six. He wasn't quite clear on that. But what he was clear on is that the probability of reoffense under that test was 45% over 10 years and 52% over 15 years, 45 and 52. The other tool is a newer test, and it's called the Minnesota Sex Offender Screening Tool Revised. It has an acronym that I can't even begin to pronounce. But that test is different. It's static. It looks back at what he did. But it's also dynamic, and you've seen in the testimony some talk about dynamic. The dynamic is the ability of people to change through counseling, to change their ideals, not necessarily to change his mental illness, but learn how to deal with it and how to control himself. And although Dr. Karich tries to say in his testimony that it doesn't take into account the dynamic, he was eventually required to admit it on cross-examination when presented with his report. And he testified that that sex offending screening tool scored Warren Snapp with a low risk, and he corresponded that low risk with a probability of 16 to 20% probability of reoffending, 16 to 20% depending what sample they used. And what does Karich say to that? Well, obviously confronted with the obvious conclusion that 16 to 20% can't be anywhere near substantially more probably than not, he attacks the test. He first admits that the test says he's not at risk, but his opinion is different, and he says that my opinion is better. And he says that even though his appendix, and this came out in cross-examination with regard to the Minnesota test, indicates that the Minnesota test is one of the most statistically valid sexual reoffense predictors available. But he says they're not all they're cracked up to be. And that would be nice, except that this appellate court actually gave me a little bit of impeachment with regard to that, because he has presented these tests in other cases. This appellate court in the 3rd District in 2006 in People v. Recolio was confronted in a sexually dangerous person case with a fry hearing on a Dr. Karich report. And part of that report was the static 99 in the Minnesota test. And the defense was objecting to the reports and to the test. And there was a fry hearing held, and the state was sponsoring these tests and sponsoring this report as reliable and readily acceptable in methodology that was generally accepted in the scientific community, and the court agreed. But what that tells us is that Dr. Karich, when these tests help him, when they help his conclusions, he embraces them. When they don't, he puts his hand out and tries to distance himself. What do our courts say about the tests? Our court regarding the commitment of Simons, which is a sexually violent person's case, as opposed to a sexually dangerous, but still the same, really embraces these tests. I've cited extensively in my brief from that case, and really that was another one of these fry hearings where they're trying to determine whether or not these tests are sufficiently reliable that they should come into evidence. And just to quote a few, and these are called actuarial risk assessment tests. And the court says, quoting learned treatise, that these type of assessments is state-of-the-art technique. It says that respected researchers urge the complete replacement of existing practice with actuarial methods and suggest that the use of clinical methods or actuarial methods are available would be unethical. The weight of the evidence points to the superiority of actuarial assessment over risk of risk, over clinical assessment of risk. In other words. Are these reports read together? How are they read together? Which reports? The static? The static 99, as I said, looks back. If you don't do anything wrong in the interim, your test score remains the same. 42% chance of, 42% probability of reoffending over 10 years. 52% over 15 years. That will be his score forever. Unless there's an intervening reoffense of some kind. The other test, which is in my mind more comprehensive because it looks at these dynamic change factors, said low risk, 16 to 20. There were two samples in the appendix. How are they read together? Well, they're not read together. They're both a little bit different. But what they're read together in this case, they must mean that neither one of them results in a probability that is much more likely than not. Much more likely than not must be significantly greater than 50%. And here we have a 16 to 20 at best and then we have a 52. Neither one of those tests suggest a probability that is much more likely than not. At best, the best test for the state says we're about even. That's where the standard fails and that's where the proof fails in this case. Mr. Bertani, was there any additional evidence besides the testimony of Dr. Karich and Dr. Stanislaus? There was not. The defendant in this case exercised his right under our Fifth Amendment to decline to testify in this jury trial. There was no further evidence presented, no other witnesses presented. No clinicians from the Department of Corrections who actually treated him whatsoever. I guess I'd better sum up then. So I guess, again, we're at the 16 to 20 at best, 52% at worst. And neither one of them can be much more likely than not. And we have a Supreme Court that says these tests work and it cites all these quotes from these learned treatise to support that to say that they are likely more accurate than what a clinician might do. And a biased clinician in this particular case who works for the Department of Corrections. So accordingly, under that, in my mind, it doesn't matter whether you go reasonable doubt, rational trial or fact standard, or against the way, manifest way to the evidence. That's what the standard is. And I'm cognizant of the fact in this case that you could reverse this case potentially because the wrong standard might have been applied. I think you folks did that actually seven days ago when people versus Sean Hill, which was a conditional release on a insanity defense case. The attorneys wrongly advised the court of the standard. The court wrongly applied the standard as a result and you folks sent it back basically for a new trial. And that was just decided in your third district about seven days ago. I'm sorry, Justice, did you have a question? Well, I have two questions for you. Was I looking quizzical at you? I thought you were just about to stick up a hand. With regard to the static test, I can accept your argument that he's either a 42 or a 50 something, but he's in a residential facility where the target of his sexual preferences are not present. And that is children really under the age of 10. So how do we measure whether when the doors open up, is he likely to leave? Well, I can probably answer that, but I would probably go significantly over my time. I have about 30 seconds to do that. It's all right to go over your time as long as you're answering the question. And I have another question to follow up. Well, we have an interesting piece of evidence inside for that. There's a man and there's another SDP, another inmate, I'll just call him just for ease because I can't say SDP for some reason today, named Larry McGeehan, who Dr. Karich says is in his 20s who looks like he's 12 but acts like he's even younger. I understand where you're going. And since there was no sexual relationship between those two, you think those circumstances and support of you that he is? I don't certainly think that it guarantees that he won't, but it suggests that this gentleman has learned some skills that render him capable of controlling his sexual impulses. It's not conclusive, but it's some evidence. And it's the only evidence we can have inside. My other question to you is in reference to page 25 on your brief, you mentioned just in passing the privilege against self-incrimination. And you seem to suggest that it attaches in the sexually dangerous person petition context. And you cite to Treanor. You do not mention the U.S. Supreme Court decision in People v. Allen that says the Illinois Supreme Court got it right. There is no privilege against self-incrimination in Illinois in the context of these sexually dangerous person petitions. Let me just say this because I know we're running out of time. You did cite to us People v. Burns, a 2004 Illinois Supreme Court decision. I'm going to rely on Burns because I think in that case in 2004, our Supreme Court does say the privilege against self-incrimination. I read it the other way. I read it the other way. It does not apply in a sexually dangerous person petition. I'm going to operate under that assumption that Burns controls the issue that self-incrimination is not part of the due process. That attaches in these proceedings unless you communicate with me in writing and share it with counsel after the oral arguments. I think Burns controls on that issue. And I may address that later, but we'll go from there. And the other question that I have for you is maybe in rebuttal. Assuming there is no privilege against self-incrimination, how would that affect your closing argument? I think that it would undermine that argument significantly, Your Honor. We still talk about shifting the burden of proof, and I think that argument stands on its own. It stands on its own, but the state has the burden. So please let me know if I'm misreading Burns from our Illinois Supreme Court. Thank you, Mr. Bertani. Thank you very much. Mr. Nicolosi. Thank you. Good morning. May it please the Court, may it please counsel, may it please the audience. I feel privileged that I get to be the one to show the students in the audience that there are lawyers here who are dreadful public speakers, and that is me. But I'll try to tremble through this as best as I can. Your Honors, very simply, both doctors that testified in this case, regardless of the burden of proof, testified that there is a substantial probability that the defendant will, you know, a substantial probability that he will commit a sex offense in the future. And they made this, it is true that they did not treat the defendant, but they interviewed him for three hours, and they reviewed countless reports and discussed the issue with therapists, and they were able to form their opinions. Would not a treater, a treating doctor or a psychologist or social worker have been a better witness to this? Perhaps. They could have maybe called the therapist who dealt with him on a regular basis, but the fact is that Dr. Karich and Dr. Stanislaus, they were, they had access to all of the therapist's reports, and they went through them in depth and were able to form their opinions. Your Honors, I believe, while counsel did mention that the proceedings here are for the purposes of looking ahead to see what the defendant will do in the future, it's also necessary to look at this gentleman's past history of sex offenses, and there's a very, very lengthy history. I will go through it very briefly. When he was a young child at six years old, he was imitating sex acts. He had sexual intercourse and other inappropriate behaviors with his siblings, two of his brothers, two of his sisters, when those siblings were between the ages of seven and 12. He molested his cousins, who were between the ages of eight and 10, and his siblings when he was home on leave from the Marine Corps. He showed interest in his wife's 12-year-old sister and her eight-year-old brother, an eight-year-old brother of which he abused sexually repeatedly. And then in 1973, it started getting criminal. But he started getting charged with criminal offenses. In 1973, he was charged and convicted for performing oral sex on several karate students. He was their instructor. While he was in prison, he wrote letters to these students apologizing, saying he wanted to remain friends, and also saying he couldn't control himself. Four years later, in 1977, he was released. He then molested his eight-year-old niece. He's sent back to the O.C. for violating his parole. Returns back to the O.C. in 1992. He decided to become a Little League coach. At that point, he fondled and kissed a baseball player, and also tried to grab and kiss the player's sister. That was in 1992. Mr. Nicolosi, when did Mr. Snap enter the Sexually Dangerous Persons Program? Your Honor, he entered in 1999, after the 1997 conviction for aggravated criminal sex abuse of his nephew. In 1999, he became a sexually dangerous person. And this is a program that is utilized by the State of Illinois to give corrective treatment to persons who are sexually dangerous? Yes, Your Honor. He's been undergoing that treatment for ten years? A little more than that. A little more than ten years. Dr. Karich is in charge of that program? Yes, Your Honor. And has developed a lot of programming that is supposed to make significant difference in terms of the behavior? What evidence is there that Mr. Snap would still engage in the kinds of behavior that you were describing as his earlier conduct? Your Honor, basically, both doctors testified that the respondent has not made much progress at all in his treatment. And I understand the treatment is designed to rehabilitate, as best as possible, these offenders for when they are released, to be able to control their impulses better on the outside. But both doctors testified that this defendant, in particular, has not made the progress. And it's still substantially probable that he will reoffend, and they testified to that. And the reasons are quite significant. First of all, he still suffers from many of the same disorders that he has had in the past. Narcissism, superiority, entitlement. And he generally believes that the rules don't apply to him. And that carries over to his treatment in custody. He actually thinks that while the treating doctors can't help him, he feels like he can actually help the other offenders in the sexually dangerous person program. This, of course, goes to his superiority complex and things like that. And the doctors testified that it's mental hang-ups like this that are preventing him from really getting into his treatment and really doing what he needs to do. Is that part of the static 99 test results? No, Your Honor. Is that layered on top of those sexual issues? Yes, Your Honor. These are additional, I guess they call them dynamic factors that they consider, such as the defendant's motivation to complete treatment, his empathy towards his victims, things like that. One such dynamic factor in addition to the static test, which I will get to in a second, is the fact that he refuses to delve deep into his treatment. For example, I believe it was Dr. Stanislaus went up to him and said, we would like you to advance to the next stage of therapy here. And he refused. He felt he was comfortable down in the lower level of treatment. Of course, all this treatment is voluntary. But nevertheless, this really highlights the fact that he isn't as interested in his therapy as he needs to be. And these problems still persist to this day. The fact that he denies a lot of these incidents. Except for the incidents against the karate students and the incident against his 8-year-old niece, he denies all other incidents. He refuses to speak about the incidents with his siblings because he feels that it will re-victimize them in some way. But again, Dr. Stanislaus said, it's a mindset like this which prevents him. He's putting up these walls, these defenses, from really discussing his problems in his past and learning why he offended in the past. And learning ways to learn from those to help himself in the future. Would those be factors then that would be looked at in the Minnesota test? Would those kinds of things that you're discussing now be factors that would be considered in the Minnesota test? No, Your Honor. I believe the Minnesota test actually does have some dynamic factors involved. Dr. Karich didn't testify at length about those. The static 99 test is solely based on his history. Like counsel said accurately, that score is not going to change as long as he doesn't re-offend. And if he's in prison, he can't re-offend. The problem with these static tests, the static 99 of the MN SOSTR, is the fact that they don't, and I believe counsel misspoke, he said that for the static 99, it was 52% possibility that he would re-offend over 15 years, and 45% over 10 years that he would re-offend. And for the MN SOSTR test, there's a 16 to 20% chance that he would re-offend if released. That's incorrect. These tests do not predict whether or not he will re-offend. We're using that as a term of art. But what the static 99 test tells you is that there's a chance that he will be re-convicted, and that chance is 52% over 15 years. And for the MN SOSTR, that's a 16% chance he will be re-arrested using these terms of art that we need to, because the fact is, and Dr. Karich testified that's one of the problems with these tests, is that they don't talk about re-offense. They only talk about for the one if you're re-convicted, which of course, unfortunately there are incidents all the time that happen, and maybe for whatever reason the victim doesn't feel like going forward. It never gets to the point where people can obtain a conviction. And for the MN SOSTR, that's re-arrest. It's the same thing. Just lots of events happen. For whatever reason, they don't get into the formal process where they would get to the point that these tests predict. So the fact is, we need to figure out if he is going to re-offend. And since these tests don't really discuss re-offending, we need to look at the dynamic factors. And both doctors testified that he just has not progressed in his treatment. Dr. Karich actually said he has made a little bit of progress, but they said it's absolutely nowhere near to the point where he can be re-released. Mr. Nicolosi, I'm confused. My recollection is that Dr. Karich was the one who was pushing the use of these tests. He said that it was important to have the actuarial test to remove the element of subjectivity from making this determination. And the state has been arguing for years that these tests should be the definitive test, as did the Supreme Court in Simon. And also Dr. Karich said that the good thing about the Minnesota test, as opposed to the static test, is that it does measure some dynamic factors. And yet you're standing here today telling us that we really shouldn't pay any attention to these results because there's all this possibility that there may be unreported sex offenses and there won't be convictions. I'm not quite understanding the I-want-to-have-my-cake-and-eat-it-too kind of argument. I understand, Your Honor, that Dr. Karich has testified in the past that these are important tests to consider. And I'm not saying that they're not important to consider now. I'm just saying that there are certain qualifications that need to be discussed with these tests. As I said, one of them deals with convictions, but one of them deals with arrests. We're talking about reoffending, and Dr. Karich, he didn't hide behind that. He said that's what we're after here. And I understand, you know, considering the tests on their own, the one test that says 52 percent of being reconvicted over 15 years, that's a pretty strong percentage based on the fact that you have to consider that there are offenses that could be committed that don't make it to the point where this test comes forward. And Dr. Karich just said that it's important to see, it's been 10, 11 years that this gentleman's been in treatment and incarcerated and that his treatment, of course, is an important consideration and how he's progressing and the things that he's trying to do to make himself better. And these things just need to be considered in addition to the static tests on their own. There was something in the record to the effect that 56 percent, I think it was, of people where Dr. Karich had recommended that they were not ready to be released had actually been released and had not been returned to prison, is that correct? I don't know the numbers offhand, Your Honor, but I know he did talk for a while about the numbers that have been re-released. But the fact is, it sounds like he has a pretty good indicator of what's going on. That's still a significant number, the 44 percent or the number on the other side. But again, this proceeding is about this gentleman in particular and both Dr. Stanislaus and Dr. Karich were very adamant that this gentleman is not ready to be released into the community and that there's just a much more likely than not possibility that he's going to re-offend again. And as Justice Wright mentioned earlier, that while he's been in prison these 11 years, he has not been exposed to the target demographic of his victims from the past. But I do believe that the gentleman that he has associated with in there, the gentleman in his late 20s who looks like he's 12, acts like he's 5 or 6, Dr. Karich testified this is very common amongst people in the SDP program.  I don't know, remind themselves of the people they like, basically, their target. What is this fellow doing in this place? Oh, the other gentleman? Yeah, the one who acts like he's 5 or 6. I mean, is there... I don't remember. The implications to me are that he is disabled in some way. Me too, Your Honor. And what is he doing there with all these older... I don't remember, Your Honor. I don't remember. And does that serve anybody's purpose, the predators or this fellow? It seems like maybe there's a little temptation there, Your Honor. And then to talk about him as evidence here, you know, and say, well, we put him in there, but... Yes, yes, Your Honor. That's an excellent question. I don't know if he was in the SDP program or if he was in the general population. I don't recall from the record if there's any intermingling of the two populations. But the fact is that this gentleman, Dr. Karich, believes it's just inappropriate for them to be commingling. And even though Dr. Karich doesn't know if they have had any sexual contact, he didn't testify for sure that he knows because he can't, you know... I thought he did say that there had been none. To his knowledge, there had been none. To his knowledge. Thank you. What is conditional discharge for? I don't believe I know the answer to that one, Your Honor. Is that to let someone go into the community to see how they do when they're exposed to the target population? I would guess yes. From my experiences in McLean County State's Attorney's Office, I believe that's what can be a conditional discharge. It was more, I don't want to say more or less probation, but something where they do release them. But the fact is, Your Honor, there are decades of incidences where this gentleman has been free and has not been able to control himself with younger people. Has he been free since he started this program? Has he been free? No, Your Honor. But the fact is, in the early 90s and the mid-90s, he was free. He had a chance to be free. He was born in 1945. This isn't a young man. He's had plenty of time to learn. He's had treatment between 74 and 77 and 1992 to 96, and he still re-offended when he was re-released. And the fact is, as Justice Wright pointed out, there are no young people between the ages of 7 and 10 in the Sexually Dangerous Persons Program to test this gentleman. And the fact is, that's what Dr. Karich and Dr. Stanislaus are there for because they're the ones who are reviewing all this material, and they're the ones who are able to make the determination whether or not he's fit to be released, and they clearly don't believe he's fit to be released. Thank you. With that, I'd be happy to answer any other questions if there are any more. I think we do. Thank you very much, Dr. Nicolosi and Mr. Bertani. Any rebuttals? I'm going to be relatively brief, I hope, unless you have a bunch of questions. But I don't know if it's brief, but then again, sometimes it's not possible for me to be brief. This is, after all, again, a recovery proceeding, and counsel has correctly summarized this man's past history. I have no issue with that. But this is a recovery proceeding, and with regard to his treatment in the 70s and with regard to his treatment in the 90 and 94, Dr. Carrich's testimony clearly in the record is that that was a different program. There was no comprehensive treatment program as they have now concentrated and specialized at Big Muddy Correctional Center down in Ina, Illinois. And he's been in treatment. And Dr. Stanislaus actually admits in her testimony that this gentleman is capable of being released. He's capable of responding to treatment. She just thinks he hasn't yet. And I want to address this issue of him being asked to go to the next level and him refusing. He gets asked that question in this three-hour forensic interview by people who came into the court in Will County and said, He's not progressing in therapy. He hasn't done enough. And then they jackpot him with this question, Would you like to proceed to the next level? Wholly internally inconsistent. It's like the last case that was here. It flies in the face of logic. They jackpotted him. They asked him a question he couldn't answer. A few more things. He's 65 years old right about now. He turned 65 in July. He's been under this program fashioned by Dr. Karich for 11 years. I think the actuarial risk assessments that have been adopted clearly show that he is not likely to reoffend or not substantially more likely than not to reoffend. We can parse words all we want. The bottom line is Dr. Karich uses these tests when they help him. He tries to distance himself when they don't help him. He can't have his cake and eat it, too. The Supreme Court says they're valid and that they have certain great relevancy and weight. What about Mr. Nicolosi's distinction, though, that these tests register likelihood not of reoffending as such but of becoming re-arrested or re-convicted? Happy to answer that. Mr. Snapp didn't invent these tests. He never heard of them until Dr. Karich administered to him. These are tests that the scientific community, and there was all kinds of testimony about all these organizations that Dr. Karich subscribes to and is in, have developed for a sexual reassessment tool. They are designed to predict the risk. The only way we can measure a risk of reoffending is when they come into the system in the Minnesota one, which is re-arrest or they get convicted in the much older static test. It's the only way we can measure these things. You can't speculate on what's going on out there that's not reported. How could they statistically evaluate it otherwise? These are tools that they have scientifically developed, actuarially developed, and that Dr. Karich embraces when it suits him. Again, this Larry guy, McKeon, looks like he's 12, acts like he's 6. The testimony is that he is a SDP. The testimony is that Dr. Karich says that this guy is my client's victim type and that he feels that there's risk that my client may take advantage of him. Dr. Karich testified that this gentleman, Mr. McKeon, has sexually acted out and has been caught sexually acting out with other SDPs at the facility. But no such evidence exists with regard to my client. My client has demonstrated ability, even when confronted with his alleged victim type, behind the walls down there in Illinois, to control himself. And that's the whole point of recovery. Conditional discharge, I think, is a good and fair question. We have two options. Any trial court has two options in these cases. Cut the guy loose, send him out into society. I am not here to suggest that that happened. What should happen, in my opinion in this case, is that this case should be reversed and remanded with a finding and a direction to the trial judge in this case that she should develop such conditions of his release that will adequately monitor him and strike a balance between seeing if he can make it out on the outside and protecting the community. What has traditionally happened in these cases, there have been restrictions about any children's activities. There's mandatory drug testing, alcohol testing, frequent contact with probation type officers. And in this modern age, we have GPS, we have alcohol monitors they can use. There are any number of a plethora of restrictions that this judge could use to try to protect the public and the children who I hold dear as well. It's not perfect, and I know that there's no children in prison, but if that were the test, no one with his mental condition would ever get out because they could never, ever demonstrate. He needs to be let out subject to very strict and severe conditions and see if what these tests say that he's not likely to reoffend, be rearrested, or be reconvicted are worth their salt. The Supreme Court says they are. The scientific community says they are. I'm asking you to find that they are. Thank you. Counsel, it has been a pleasure.